UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

WILLIAM J. SEESE,                    )        CASE NO. 1:16CV739
                                     )
        Plaintiff,                   )        JUDGE JAMES S. GWIN
                                     )        Magistrate Judge George J. Limbert
                                     )
CAROLYN W. COLVIN[1],                )        Report and Recommendation of
ACTING COMMISSIONER OF               )        Magistrate Judge
SOCIAL SECURITY,                     )
                                     )
        Defendant.                   )


        William J. Seese ("Plaintiff") seeks judicial review of the final decision of Carolyn W.

Colvin ("Defendant"), Acting Commissioner of the Social Security Administration ("SSA"),

denying his application for Disability Insurance Benefits ("DIB").  ECF Dkt. #1. For the following

reasons, the undersigned recommends that the Court REVERSE the Commissioner's decision and

REMAND the instant case:

## I.      PROCEDURAL AND FACTUAL HISTORY

        On April 25, 2012, Plaintiff applied for DIB alleging disability beginning April 19, 2012 due

to back pain.  ECF Dkt. #11 ("Tr.") at 209-218, 228-239.  The SSA denied Plaintiff's application

initially and on reconsideration. *Id*. at 104-145, 152-157, 161-167. Plaintiff requested an

administrative hearing, which was held on May 13, 2014.  *Id*. at 66, 168. At the hearing, the

administrative law judge ("ALJ") accepted the testimony of Plaintiff, who was represented by

counsel, and he also accepted the testimony of a vocational expert ("VE"). *Id.* at 66.  On September

16, 2014, the ALJ issued a decision denying benefits. Tr. at 49-59.  Plaintiff filed a request for

review of the ALJ's decision and provided additional evidence, but the Appeals Council denied

review on January 29, 2016. *Id*. at 1-45.

        On March 25, 2016, Plaintiff filed the instant suit seeking review of the ALJ's decision.  ECF

Dkt. #1.  On June 26, 2016, Plaintiff filed a brief on the merits. ECF Dkt. #12.  On August 25, 2016,

---

[1]On February 14, 2013, Carolyn W. Colvin became the acting Commissioner of Social Security,
replacing Michael J. Astrue.

Defendant filed a brief on the merits.  ECF Dkt. #14. Plaintiff filed a reply brief on September 8, 2016. ECF Dkt. #15.

**II**.        **SUMMARY OF RELEVANT PORTIONS OF THE ALJ'S DECISION**

In his decision, the ALJ found that Plaintiff suffered from throracic and lumbar stenosis, obesity, and failed back surgery syndrome, which qualified as severe impairments under 20 C.F.R. §404.1520(c). Tr. at 51.  The ALJ found that Plaintiff's mental impairment of depression was not severe because it did not cause more than minimal limitation in his ability to perform basic mental work activities.  *Id*.  Next, the ALJ determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, 20 C.F.R. §§404.1520(d), 404.925 and 404.926 ("Listings").  *Id.* at 53-54.

The ALJ found that Plaintiff had the residual functional capacity ("RFC") to perform light work as defined by 20 C.F.R.§ 404.15967(b) but with the following limitations: he can only occasionally use ramps or stairs; he can never climb ladders, ropes, or scaffolds; he can only occasionally stoop, kneel, crouch or crawl; and he must avoid even moderate exposure to hazards, including heights and machinery.  Tr. at 54.  The ALJ ultimately concluded that, although Plaintiff could not perform his past work as a dye press operator, he was able to perform a number of jobs existing in significant numbers in the national economy, including the representative occupations of merchandise marker, cashier II, and power screwdriver operator.  *Id.* at 58.  As a consequence, the ALJ found that Plaintiff had not been under a disability as defined in the SSA and was not entitled to DIB.

**III.**        **STEPS TO EVALUATE ENTITLEMENT TO SOCIAL SECURITY BENEFITS**

An ALJ must proceed through the required sequential steps for evaluating entitlement to benefits.  These steps are:

1.      An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (20 C.F.R. §§ 404.1520(b) and 416.920(b) (1992));

2.      An individual who does not have a "severe impairment" will not be found to be "disabled" (20 C.F.R. §§ 404.1520(c) and 416.920(c) (1992));

3.    If an individual is not working and is suffering from a severe impairment which meets the duration requirement, see 20 C.F.R. § 404.1509 and 416.909 (1992), and which meets or is equivalent to a listed impairment in 20 C.F.R. Pt. 404, Subpt. P, App. 1, a finding of disabled will be made without consideration of vocational factors (20 C.F.R. §§ 404.1520(d) and 416.920(d) (1992));

4.    If an individual is capable of performing the kind of work he or she has done in the past, a finding of "not disabled" must be made (20 C.F.R. §§ 404.1520(e) and 416.920(e) (1992));

5.    If an individual's impairment is so severe as to preclude the performance of the kind of work he or she has done in the past, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed (20 C.F.R. §§ 404.1520(f) and 416.920(f) (1992)).

*Hogg v. Sullivan*, 987 F.2d 328, 332 (6th Cir. 1992). The claimant has the burden to go forward with the evidence in the first four steps and the Commissioner has the burden in the fifth step. *Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

**IV.**    **STANDARD OF REVIEW**

Under the Social Security Act, the ALJ weighs the evidence, resolves any conflicts, and makes a determination of disability. This Court's review of such a determination is limited in scope by §205 of the Act, which states that the "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. §405(g). Therefore, this Court's scope of review is limited to determining whether substantial evidence supports the findings of the Commissioner and whether the Commissioner applied the correct legal standards. *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990).

The substantial-evidence standard requires the Court to affirm the Commissioner's findings if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Cole v. Astrue*, 661 F.3d 931, 937, citing *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (citation omitted). Substantial evidence is defined as "more than a scintilla of evidence but less than a preponderance." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234 (6th Cir. 2007). Accordingly, when substantial evidence supports the ALJ's denial of benefits, that finding must be affirmed, even if a preponderance of the evidence exists in the record upon which the ALJ could have found plaintiff disabled. The substantial evidence standard

creates a "'zone of choice' within which [an ALJ] can act without the fear of court interference." *Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir.2001). However, an ALJ's failure to follow agency rules and regulations "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Cole, supra*, citing *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 407 (6th Cir.2009) (citations omitted).

## V.     RELEVANT MEDICAL AND TESTIMONIAL EVIDENCE

Since Plaintiff's assertions of error concern his back impairment and depression, the undersigned confines review of the medical evidence to these impairments.

### A.     BACK IMPAIRMENT

On October 29, 2007, a lumbar spine MRI showed that Plaintiff had mild lumbar arthrospondylosis and levoscoliosis. Tr. at 300-301. Plaintiff underwent treatment for his back pain including medication management, steroid injections, nerve blocks, and physical therapy in 2008 and 2009. *Id.* at 317-326. On September 12, 2008, Plaintiff presented to Dr. Wiggers, his treating physician, for follow-up of his low back pain. *Id*. at 421. He reported that his pain was worse and he was performing physical therapy and exercises, and taking anti-inflammatories, steroids, narcotics and injections, but they did not give pain relief. *Id.* He stated that heat did give relief. *Id.* Plaintiff indicated that lifting, bending, standing, and walking aggravated his symptoms. *Id*. Physical examination of the back showed a negative straight leg-raising leg and normal examination. *Id.* at 422. He was diagnosed with low back pain and referred to the spine center. *Id*. He treated with Dr. Wiggers in 2008 and 2009. *Id.* at 412, 415-417. He also had four nerve blocks in 2008 but they did not help. *Id.*

On January 7, 2010, Plaintiff presented to Dr. Wiggers for his back pain. Tr. at 409. He reported that his pain had worsened and he was performing physical therapy, taking anti-inflammatories and narcotics, getting injections and participating in pain management. *Id.* He was using Percocet every four hours and it was not helping. *Id.* He indicated that his pain did not radiate to his legs, he had no numbness, and he had no loss of bladder control. *Id.* Plaintiff was also applying hot packs, but had no relief. *Id.* Plaintiff reported that standing and walking aggravated his symptoms. *Id.* Physical examination showed normal back and lower extremity results. *Id.* at

399-400.  He was diagnosed with a herniated disc and referred to Dr. Ahn for surgery.  *Id*. at 410-411.

On January 20, 2010, a lumbar MRI showed canal stenosis at L4-L5 due to an anterolisthesis, disc bulging and facet hypertrophy, multilevel disc dehydration and bulging and multilevel facet hypertrophy.  Tr. at 333.

On February 16, 2010, Dr. Ahn diagnosed Plaintiff with spinal stenosis at L3-L4 to L4-L5 with degenerative sponydlolisthesis at the L4-L5 level and performed a bilateral L3 laminectomy, bilateral L4 laminectomy, bilateral L3-L4 lateral decompression and foraminotomies, and a posterior spinal fusion at L4-L5 with bilateral pedicle screw instrumentation.  Tr. at 373.  Dr. Ahn indicated that Plaintiff had severe unrelenting back pain that ran down both lower extremities, as well as weakness and numbness in his legs with great difficulty walking and standing.  *Id*. at 374.  He noted that Plaintiff had failed a long course of conservative care.  *Id.*

Dr. Wiggers March 7, 2011 progress notes show that Plaintiff presented for follow-up and reported that his pain had worsened slowly over the past two weeks because he was lifting 100 pounds multiple times during the two-week period.  Tr. at 398. Plaintiff indicated that he was prescribed Vicodin to take every 8 hours, which seemed to help, until his latest back pain flare-up after lifting.  *Id*.  He indicated that his pain radiated to his right leg, but he had no numbness.  *Id*.  Plaintiff was not participating in any specific therapies, although he tried ice but had no relief.  *Id*.  Plaintiff reported that lifting aggravated his symptoms.  *Id.*  Physical examination showed normal back and lower extremity results.  *Id.* at 399-400.  He was diagnosed with lumbosacral strain and prescribed Medtrol.  *Id*. at 400-401.

Dr. Wiggers' September 26, 2011 progress notes show that Plaintiff presented for follow-up and reported that his  back pain had worsened, but there was no radiation or numbness.  Tr. at 395.  Plaintiff was not participating in any specific therapies, although he was using hot packs which did give pain relief.  *Id*. Plaintiff reported that lifting aggravated his symptoms.  *Id.*  Physical examination showed normal back and lower extremity results.  *Id.* at 394.  He was diagnosed with thoracic strain and told to continue conservative therapy of exercises and over-the-counter medications.  *Id*. at 397.

Dr. Wiggers' October 13, 2011 progress notes show that Plaintiff presented for follow-up and reported that his pain had worsened, but he had no radiation or numbness.  Tr. at 392. Plaintiff was not participating in any specific therapies, although he was using hot packs which helped.  *Id*. Plaintiff reported that lifting aggravated his symptoms. *Id.*  Physical examination showed normal back and lower extremity results.  *Id.* at 394.  He was diagnosed with thoracic strain and prescribed Flexeril and Percocet.  *Id*.

December 1, 2011 progress notes from Dr. Wiggers indicate that Plaintiff presented for follow-up reporting that his back pain had worsened, but there was no radiation or numbness.  *Id*. Tr. at 389.  Plaintiff was not participating in any specific therapies.  *Id*.  Physical examination showed normal back and lower extremity results.  *Id.* at 390.  He was diagnosed with low back pain and prescribed a Lidocaine patch.  *Id*.

On January 11, 2012, Dr. Khalil diagnosed Plaintiff with postlaminectomy syndrome and performed a medial branch block at L2-L3, L3-L4, L4-5 and at the dorsal root of L5-S1.  Tr. at 370. On February 11, 2012, lumbar x-rays showed the metallic fixation devices were in place from his surgery, disc space narrowing at L4-L5 with preserved vertebral body alignment, and small anterior and lateral osteophytes at several levels.  *Id*. at 379.

Dr. Wiggers' February 13, 2012 progress notes indicate that Plaintiff presented for follow-up and he reported worsening back pain.  Tr. at 387.  Plaintiff was prescribed Nacynta from the pain center and indicated that it was not giving relief.  *Id*.  He also stopped using Vicodin every 12 hours as it was not effective.  *Id.*  He was also using Tramadol with no relief.  *Id.*  Plaintiff denied numbness or radiation of his pain and physical examination showed normal spinal curvature, no tenderness to palpation, normal muscle tone, negative straight leg-raising test and normal flexion, extension, rotation and bending.  *Id*. Lower extremity examination was also normal.  *Id.*  Plaintiff had tried a TENS unit but it did not help.  *Id.*  Dr. Wiggers diagnosed Plaintiff with failed back syndrome and depression.  *Id*. at 388.  He sent Dr. Khalial an email about the worsening of Plaintiff's back pain and also informed him of a need to adjust Plaintiff's depression medications. *Id.*

-6-

March 12, 2012 notes from Dr. Wiggers show that Plaintiff presented for follow-up of his back pain and he reported that the pain had worsened.  Tr. at 384.  Plaintiff indicated that Vicodin was working when he took it every 12 hours, but relief was short-lived.  *Id.*  Plaintiff denied numbness or radiation of his pain and physical examination showed normal spinal curvature, no tenderness to palpation, normal muscle tone, negative straight leg-raising test and normal flexion, extension, rotation and bending.  *Id.* at 385.  Lower extremity examination was also normal.  *Id.*  Dr. Wiggers diagnosed Plaintiff with low back pain, depression, gastroesophageal reflux disease ("GERD"), hypertension and hyperlipidemia.  *Id.*  He referred Plaintiff to a pain management clinic and to a psychiatrist.  *Id.* at 385-386.

On April 20, 2012, Dr. Sahgal, Plaintiff's treating physician and physiologist, referred Plaintiff for a functional capacity evaluation by University Hospital's occupational therapy clinic. Tr. at 505.  Plaintiff reported to the Occupational Therapist Edelstein that he had lost his job and was upset.  *Id.*  Mr. Edelstein.noted that Plaintiff reported low and mid-back pain and pain in his left thigh and leg.  *Id.*  Mr. Edelstein conducted a number of tests, including dexterity tests, grip strength, a musculoskeletal evaluation, mobility evaluation, material handling tasks and physical effort findings.  *Id.* at 505-508.  He concluded based upon his observation and the test results that Plaintiff put forth sub-maximal effort.  *Id.* at 510.  With this conclusion, Mr. Edelstein cautioned that, "this evaluator is by no means implying intent.  Rather, it is simply stated that Mr. Seese can do more physically at times than was demonstrated during this testing day.  Any final vocational or rehabilitational decision for Mr. Seese should be made with this in mind."  *Id.*

Mr. Edelstein further noted that Plaintiff's reported pain levels of 9/10 both before and after the evaluation were not congruent with his reports of pain as he was able to participate in tasks including walking, dexterity testing, transferring sit to stand and range of motion testing and walked independently upon leaving the clinic.  Tr. at 511.  Based upon the testing and Mr. Edelstein's findings, he concluded that it was not possible to quantify Plaintiff's maximum physical tolerances. *Id.*  He set forth the chart of Plaintiff's physical tolerances to specified activities indicating that he had no tolerance to any of the 18 identified activities, including walking, standing, sitting, reaching

forward and overhead, fingering, handling, bending/stooping, and crouching.  *Id.*  Mr. Edelstein recommended behavioral therapy with further attempts at physical rehabilitation. *Id.*

On May 22, 2012, Plaintiff was discharged from physical therapy for his low back pain due to his ability to continue with home program therapies and secondary to his lack of progress in therapy.  Tr. at 444-461.  He participated in therapy at University Hospitals beginning April 11, 2012 upon order from Dr. Sahgal.  *Id.* at 461.

On July 23, 2012, x-rays of Plaintiff's thoracic spine showed moderately severe spondylosis. Tr. at 611.

On July 26, 2016, Dr. Wiggers wrote a letter "To Whom it May Concern" indicating that he was writing about Plaintiff and Plaintiff could no longer perform his job duties and needed to be off of work indefinitely.  Tr. at 476.

On September 20, 2012, Dr. Saghal completed a physical capacities evaluation for Plaintiff. Tr. at 504.  He opined that Plaintiff could lift and/or carry up to one pound frequently and five pounds occasionally, he could sit, stand and/or walk up to one-half hour each per eight-hour workday, and he could never work with or around hazardous machinery, rarely push/pull with his arms and legs or bend or stoop, occasionally climb stairs and ladders or balance, and he could frequently perform gross and fine manipulations, reach, and operate a motor vehicle.  *Id.*  He further opined that Plaintiff would be absent from work as a result of his impairments or treatment more than four days per month.  *Id.* He cited to Plaintiff's back pain and fatigue for his restrictions and he referred to the functional capacities examination for full results and explanation.  *Id.*

On November 16, 2012, Dr. Saghafi performed an examination and evaluation for the agency.  Tr. at 513.  He noted Plaintiff's chief complaint of chronic back pain, especially when walking and standing.  *Id.*  Upon physical examination, Dr. Saghafi found that Plaintiff had pain in the back, but no muscle spasms, deformities or muscle wasting or flexion contractures.  *Id.* at 514-515.  He observed that Plaintiff had a normal gait and did not need an ambulatory aid.  *Id.* at 515. Based upon his examination and review of Plaintiff's medical history, Dr. Saghafi diagnosed Plaintiff with chronic low back pain and he opined that Plaintiff could sit up to 8 hours per day and stand/walk up to 6 hours per day with no ambulatory aid.  *Id.* at 516.  He further concluded that

-8-

Plaintiff was able to lift/carry up to 10 pounds frequently and up to 20 pounds occasionally, and he could push, pull and manipulate objects. *Id.* He further opined that Plaintiff was able to operate hand and foot-controlled devices, he could drive a motor vehicle and travel, and he could climb stairs. *Id.* He found that Plaintiff's ability to remember and maintain attention were within the normal range. *Id.* Dr. Saghafi attached his manual testing results and noted that Plaintiff did not participate in an active range of motion test as he stated that his back was too painful and he was in too much discomfort. *Id.* at 519-521.

In December of 2012, Plaintiff presented to Neighborhood Family Practice to establish care. Tr. at 547. Nurse Practitioner Ebbit noted that Plaintiff was treating at University Hospital but he was no longer insured and could no longer treat there. *Id.* He explained that he was applying for social security benefits based on his chronic back pain. *Id.* Ms. Ebbit examined Plaintiff and found that he was positive for back pain and depression. *Id.* He had a flat affect and was somewhat guarded. *Id.* at 547-548.

In January, February, and March of 2013, Plaintiff was examined by Nurse Practitioner Ebbit at Neighborhood Family Practice for his hypertension, chronic pain syndrome, esophageal reflux and major depressive disorder. Tr. at 526-536, 591. In February of 2013, Plaintiff reported increasing low back pain and complained that he did not think that it was ever going to get better. *Id.* at 537. His medications were continued. *Id.*

On April 19, 2013, Dr. Saghafi performed another examination and completed a physical capacity evaluation form for the agency. Tr. at 554. He noted Plaintiff's chief complaint of chronic progressive back pain, especially when walking or lifting. *Id.* Plaintiff had limited range of motion and he had to sit down to relieve his pain. *Id.* He indicated radiation of pain down both of his legs. *Id.* He reported that he still had as much discomfort as he did prior to his back surgery. *Id.*

Upon physical examination, Dr. Saghafi found that Plaintiff had back pain, pain in his joints, with no muscle wasting or flexion contractures. Tr. at 555. Dr. Saghafi observed no muscle spasms in the back and no gross deformity. *Id.* at 556. He observed that Plaintiff had a normal gait, he did not need an ambulatory aid, and he had no muscle atrophy. *Id.* Based upon his examination and review of Plaintiff's medical history, Dr. Saghafi diagnosed Plaintiff with chronic low back pain and

-9-

he opined that Plaintiff could sit, stand and walk up to 8 hours per day with no ambulatory aid. *Id.* at 557. He further concluded that Plaintiff was able to lift/carry up to 30 pounds frequently and up to 50 pounds occasionally, and he could push, pull and manipulate objects. *Id.* He further opined that Plaintiff was able to operate hand and foot-controlled devices, he could drive a motor vehicle and travel, and he could climb stairs. *Id.* He found that Plaintiff's ability to remember and maintain attention were within the normal range. *Id.* Dr. Saghafi attached his manual testing results and noted that Plaintiff would not straight leg raise or hip flex because it was too painful. *Id.* at 561. However, he noted that he actively resisted with good muscle strength on passive attempt. *Id.*

### B.    DEPRESSION

Medical records concerning Plaintiff's physical impairments document a history of depression since 2007. Tr. at 306. March 7, 2011 notes from Dr. Wiggers indicate that Plaintiff presented for follow-up of his depression and he was taking Celexa. Tr. at 398. He reported no side effects, but stated that his symptoms were worsening. *Id.* He indicated that his mood was depressed, his energy level was decreased and he was tearful. *Id.* He was sleeping well, he had no medication side effects, and he denied suicidal ideation *Id.* He was diagnosed with depression and Dr. Wiggers changed Plaintiff's medication to Wellbutrin. *Id.* at 400-401.

Dr. Wiggers' March 25, 2009 progress notes show that Plaintiff presented for follow-up of his anxiety and depression and he reported that he was taking Zoloft and he had no side effects from the medication. Tr. at 415. He stated that Zoloft was not working as his symptoms had worsened. *Id.* He indicated that he had no side effects from the medications, he slept well and his energy level was fair, although he was tearful. *Id.* He indicated that he was having problems at work which were causing panic attacks and he believed that his managers were trying to push him out. *Id.* He denied suicidal ideations. *Id.* Dr. Wiggers noted that Plaintiff appeared sad and unkempt, but he was alert and appropriate, with a flat affect, good eye contact, no delusions or hallucinations, and clear articulation and flow to his conversation. *Id.* at 416. He diagnosed depression, referred Plaintiff to psychiatry, added Depakote, and renewed a prescription for Valium. *Id.* at 417.

September 26, 2011 notes from Dr. Wiggers indicate that Plaintiff presented for follow-up of his depression and indicated that he was taking Celexa. Tr. at 395. He reported no side effects,

but stated that his symptoms were worse. *Id*. He had poor concentration, decreased motivation and depressed mood, but he was not tearful, he denied suicidal ideation, had a fair energy level and was sleeping well. *Id*. He was diagnosed with depression and Dr. Wiggers recommended that Plaintiff's medication be changed to Zoloft. *Id*. at 397.

Dr. Wiggers' October 13, 2011 progress notes show that Plaintiff presented for follow-up of his depression and reported that he was taking Zoloft and he had no side effects. Tr. at 392. He stated that his symptoms were stable, he slept well and his energy level was good. *Id*. He denied anxiety, tearfulness, and suicidal ideations. *Id*. at 393. Dr. Wiggers diagnosed depression and made no change to Plaintiff's treatment. *Id*.

February 13, 2012 notes from Dr. Wiggers indicate that Plaintiff presented for follow-up of his back pain and his depression. *Id*. at 387. It was noted that Plaintiff was taking Zoloft, but he reported that his symptoms were worsening. *Id*. He denied suicidal thoughts and reported sleeping well, but his energy level was low and he was tearful. *Id*. Psychiatric examination showed that Plaintiff was unkempt and unclean, inattentive, had a flat facial expression, avoided eye contact, had unclear articulation with hesitancy and a monotone quality. *Id*. at 388. Plaintiff's mood appeared sad and detached, although he had no abnormal thought processes or content and he had no delusions or hallucinations. *Id*. Dr. Wiggers emailed the pain management clinic and requested that psychiatry examine Plaintiff and adjust his medications. *Id*.

Records show that Plaintiff was hospitalized at St. Vincent Hospital from June 14, 2012 to June 20, 2012 after wandering around the Teamsters Union building looking for his girlfriend. Tr. at 617-631. Most of the records are illegible, but Plaintiff was diagnosed with psychosis, not otherwise specified, and rated Plaintiff's global assessment of functioning ("GAF") a 25, indicative of behavior considerably influenced by delusions, hallucinations or serious impairment or an inability to function in almost all areas. *Id*. at 631. He was discharged with Zyprexa and scheduled to follow up with a doctor. *Id*. at 637.

On August 4, 2012, Dr. Misja, Ph.D., conducted a psychological evaluation of Plaintiff for the agency. Tr. at 477. Dr. Misja noted that about a month prior, Plaintiff was in the psychiatric ward at St. Vincent Hospital after police found him walking around the Teamsters Union Building

at 3 a.m. *Id*. at 478. He believed at that time that his girlfriend was locked inside of building and when police found him, they took him to St. Vincent, where he stayed for 7-10 days. *Id*. He told Dr. Misja that he did not know what his diagnosis was and he had never received mental health services before. *Id*. at 478-479.

Plaintiff reported to Dr. Misja that he does all of the meal preparation, cleaning, laundering and shopping. Tr. at 479. He has a driver's license and he belongs to an American Legion Post but does little socializing. *Id*. He used to bowl but quit because of his back problems. *Id*. He indicated that he had sleep difficulties due to his back pain, but his energy level was good. *Id*. at 480.

Upon examination, Dr. Misja observed that Plaintiff was polite and made good eye contact, but he had to repeat questions because Plaintiff did not understand what he was asking and Plaintiff had difficulty expressing himself and explaining the events of his life. Tr. at 479. Plaintiff's speech was normal, his affect was blunted and his mood was depressed and stable. *Id*. at 480. There was no evidence of hallucinations or delusions and Dr. Misja estimated that Plaintiff was in the low average range of intelligence. *Id*. He found Plaintiff's insight to be poor to fair and his judgment to be fair. *Id*.

Dr. Misja diagnosed Plaintiff with major depression and rated his GAF at 55, indicative of moderate symptoms. Tr. at 480. He opined that Plaintiff would have no problems understanding and implementing ordinary instructions and he would have minimal difficulty in maintaining attention, concentration, persistence and pace for simple and multi-step tasks, in responding appropriately to supervision and coworkers in a work setting, and in responding appropriately to work pressures in a work setting. *Id*. at 480-481.

On April 26, 2013, Dr. Misja conducted another psychological evaluation of Plaintiff for the agency. Tr. at 563. Dr. Misja noted that Plaintiff complained of chronic back pain and depression. *Id*. at 564. Plaintiff reported that he recently moved back in with his ex-wife because he had no income. *Id*. He also indicated that he anticipated having to use a wheelchair in the future, although Dr. Misja noted that while Plaintiff walked with a limp and walked stiffly, he did not use an assistive device. *Id*. at 565.

Plaintiff reported to Dr. Misja that he does not cook, clean, do laundry or shop, as his ex-wife does all of those chores by choice because she wanted to help him. Tr. at 566. He has a driver's license and he belonged to no groups or organizations and had no personal interests or hobbies. *Id*. He further indicated that he had no friends and used to bowl but quit because of his back problems. *Id*. He indicated that he had difficulty falling and staying asleep due to his back pain but his energy level was good. *Id*. at 480.

Upon examination, Dr. Misja observed that Plaintiff responded to questions briefly and did not elaborate, and he had unremarkable speech, a blunted affect and a stable and depressed mood. Tr. at 566. He had no suicidal ideation, feelings of anxiety, and no evidence of hallucinations or delusions. *Id*. at 567. Dr. Misja estimated that Plaintiff was in the low average range of intelligence. *Id*. He found Plaintiff's insight to be poor to fair and his judgment to be fair. *Id*.

Dr. Misja diagnosed Plaintiff with major depression and rated his GAF at 55, indicative of moderate symptoms. Tr. at 567. He opined that Plaintiff could understand, remember and carry out ordinary instructions and he would have minimal difficulty in maintaining attention, concentration, persistence and pace for simple and multi-step tasks, in responding appropriately to supervision and coworkers in a work setting, and in responding appropriately to work pressures in a work setting. *Id*. at 567-568.

### C. MEDICAL RECORDS SUBMITTED AFTER ALJ HEARING AND TO APPEALS COUNCIL

Records submitted to the ALJ after the hearing included records from Metro Health Hospital dated October 11, 2013 from Certified Nurse Practitioner ("CNP") Kocher after Plaintiff presented to her complaining of, inter alia, stress and back pain. Tr. at 645. Plaintiff reported that Dr. Fox had recommended back surgery, but he did not want surgery, and anesthesia pain management was also recommended, but Plaintiff was not willing to do that either. *Id*. at 646. His Vicodin was refilled, Robaxin was discontinued, he was prescribed Zanaflex, and he was told to continue his home exercise program and consider a second opinion from anesthesia pain management. *Id*. at 647. Other records submitted from Metro Health show phone calls from Plaintiff to the provider requesting a TENS unit and refills of his prescriptions. *Id*. at 648-685.

-13-

On January 3, 2014, Plaintiff presented to CNP Kocher complaining of not sleeping well due to back pain. Tr. at 686. He wanted to change his Zanaflex prescription to Flexeril. *Id*. He also indicated that his feet were swollen all of the time even though he was taking prescribed Lasix and he was walking around the block daily over the last couple of weeks. *Id*. He was diagnosed with bilateral leg edema and low back pain, inter alia, and his Lasix was increased, he was prescribed Flexeril, and Zanaflex was discontinued. *Id*. at 689. Records in March of 2014 show a diagnosis of diabetes mellitus for which Plaintiff was prescribed Lantus. *Id*. at 715-719. He did not want to start Lantus, so another medication was prescribed. *Id*. at 721. He followed up for diabetes mellitus treatment and monitoring. *Id*. at 721-734.

A Metro Health Hospital note to CNP Kocher on March 28, 2014 indicated that Plaintiff requested that she write a letter or recommendation for social security purposes. Tr. at 735. CNP Kocher advised that Plaintiff needed to make an appointment with her to discuss his situation. *Id*.

On March 11, 2014, Plaintiff presented to CNP Kocher for follow-up as to his diabetes mellitus, to request an increase in his Zoloft dosage, and to request a letter for social security disability. Tr. at 746. Plaintiff indicated that he was using Vicodin three times per day and wanted to switch to Percocet for his back pain. *Id*. He also stated that Dr. Fox recommended surgery, but he did not want to undergo surgery and he did not want to see the anethesia pain clinic for further pain management. *Id*. He also requested the increased Zoloft dosage because he was having trouble motivating himself. *Id*. He indicated that he walked one mile on most mornings. *Id*. CNP Kocher increased Plantiff's Zoloft dosage and continued the Vicodin. *Id.* at 748. She also told Plaintiff to follow up with the physical medicine and rehabilitation clinic for a disability letter. *Id.*

On May 27, 2014, Plaintiff presented to CNP Kucher for a complete physical examination. Tr. at 774. He reported his chronic back pain and declined a referral to physical medicine and rehabilitation, saying "it's too late. Next is morphine drip." *Id*. He reported that his sleep was disturbed due to his back pain. *Id*. Physical examination revealed decreased range of motion and back pain. *Id.* at 778. Diagnoses included diabetes mellitus, depression, low back pain and fatigue. *Id*. Ms. Kucher continued Plaintiff's diabetes medications, continued Plaintiff's Flexeril and Vicodin for back pain, continued his Zoloft for depression, and continued his Trazadone for fatigue

and sleep problems. *Id.* She noted that Plaintiff declined a referral to physical medicine and rehabilitation and a referral to a sleep clinic. *Id.*

On November 25, 2014, Dr. Mulloy of University Hospitals, wrote a letter to Dr. Ahn as Dr. Ahn had requested that she conduct an evaluation as to Plaintiff's disability. Tr. at 802. She noted that Plaintiff had applied for social security disability benefits in 2012 and was denied in 2014, but he was appealing. *Id.*

In her letter, Dr. Mulloy described Plaintiff's history of back pain, his 2010 back surgery, and his complaints of ongoing, constant, throbbing, back pain. Tr. at 801-803. She noted his report of his daily activities and limitations from his back pain, and from his depression. *Id.* at 803. She reviewed his medical records, including an August 29, 2014 evaluation by Dr. Fox, who noted that Plaintiff had failed back surgery syndrome, low back pain and a new diagnosis of cervical spondylosis without myelopathy and cervical strain. *Id.* at 804. She indicated that Plaintiff had completed 9 physical therapy visits in 2012 and was discharged due to lack of progress. *Id.* She noted that Dr. Fox had recommended Vicodin and Lidocaine for Plaintiff's neck and back pain, and he recommended a second opinion for anesthesia pain management which Plaintiff declined. *Id.*

Dr. Mulloy indicated that she had reviewed the AMA Guides to the Evaluation of Permanent Impairment, 6th Edition, and Plaintiff's impairment would be in Class 3 at 20% impairment according to Table 17-4 Lumbar Spine Regional Grid. Tr. at 804. She reviewed the functional capacities evaluation of April 2010 in which it was noted that Plaintiff exerted submaximal effort. *Id.* She explained that she did not feel the need for a repeat functional evaluation since the evaluation in the file was somewhat current and MRIs indicated no changes in Plaintiff's conditions. *Id.* She also noted that Plaintiff was taking a narcotic and muscle relaxer which would limit his work capacity as they cause dizziness and drowsiness. *Id.*

Based upon the functional capacities evaluation and Plaintiff's report of daily activity limitations, Dr. Mulloy opined that Plaintiff could lift and carry up to 2-3 pounds frequently and up to 5 pounds occasionally. Tr. at 804. She further opined that Plaintiff could push and pull under ten pounds only rarely. *Id.* She further concluded that Plaintiff would not be able to stoop, crouch, or crawl, he could kneel only rarely, he could not perform repetitive bending, he could climb stairs only

occasionally and could not work at heights or on scaffolding or drive or operate machinery or vibratory equipment.  *Id.*  Further, she opined that he was limited in working in cold environments, he had to change positions frequently in any environment and had to be able to sit and stand and walk short distances if needed.  *Id.*  Dr. Mulloy concluded that the restrictions she opined would bar Plaintiff from any heavy labor job and would make it difficult for him to find any gainful employment wit no formal training other than a welding certificate.  *Id.* at 804-805.

Additional records submitted included a November 26, 2014 admit note by Psychiatrist Dr. Vaghela, who indicated that Plaintiff presented indicating that he was pursuing disability and "looking for a bipolar diagnosis."  Tr. at 22.  Dr. Vaghela observed that Plaintiff was oriented and alert with an appropriate affect.  *Id.* at 24.  He had good eye contact, logical speech and unimpaired memory.  *Id.*  He had no significant preoccupations or hallucinations and his judgment was good, he had normal attention and concentration, and normal impulse control.  *Id.* Dr. Vaghela diagnosed recurrent major severe depressive disorder without psychotic features, and mood disorder.  *Id.* at 25.  Plaintiff's GAF was rated at 45, indicative of some impairment in reality testing or communication or major impairment in several areas.  *Id.* Dr. Vaghela decreased Plaintiff's Zoloft dosage, added Trileptal, Restoril and Vistaril, discontinued Trazadone, continued the other medications, and set up therapy sessions.  *Id.*

Plaintiff followed up with Dr. Vaghela on January 13, 2015 and Dr. Vaghela made the same mental status findings as previously indicated.  Tr. at 28.  The same diagnoses were made as well, and the GAF was again rated at 45.  *Id.* at 29.  Plaintiff had reported poor pain control, poor sleep, poor focus, racing thoughts and poor self-esteem.  *Id.*  Dr. Vaghela discontinued Wellbutrin and switched Plaintiff to Cymbalta, added Zyprexa, increased the Vistaril dosage, continued Trileptal and Restoril, as well as the other medications, and continued individual therapy sessions.  *Id.*

A December 10, 2015 Metro Health progress note indicates that Plaintiff presented to Dr. Ng for his back symptoms and diabetes mellitus.  Tr. at 12.  His blood pressure was taken and a blood test was ordered.  *Id.*  He was told to follow up in four weeks.  *Id.*

-16-

### D    HEARING TESTIMONY

Plaintiff, who was fifty-two years old at the time of the hearing, testified that he was unable to work because of back problems from performing his job of 30 years as a dye lifter and caster.  Tr. at 72.  He reported that he last participated in therapy a couple of years ago but it did not work and he did not perform pool exercises as recommended after physical therapy, *Id*. at 73-74.  He explained that he did not comply because at the time he was going through a divorce and had things going on in his life. *Id*. at 74.  Plaintiff reported that he did use a TENS unit three times per day, he did have injections, and he took medications.  *Id*. at 74-76.  Plaintiff stated that he had no side effects from his medications.  *Id*. at 78.

Plaintiff answered affirmatively when the ALJ asked whether he was having problems with his hands due to his back pain.  Tr. at 78.  He noticed an intermittent lack of strength in his hands, which caused him to drop things, like coffee cups and plates, on a daily basis  *Id*. at 78-80.  He reported that he had pain in his back and on the right side of his spine and he had numbness in his legs.  *Id.* at 81.  He reported that he started using a cane about one year ago and it was prescribed by his doctor for him to use all of the time.  *Id*. at 81-82.  He also wore a back brace for the last 3 years.  *Id*. at 83.

Plaintiff opined that he could stand and/or walk for five minutes before having to sit or move around and he would have to sit for half an hour before he could stand again.  Tr. at 86.  He indicated that he could lift no more than 5 pounds at most.  *Id.*  Plaintiff also discussed his leg swelling due to diabetes, indicating that he had to elevate his legs four to five times per day.  *Id.* at 88.

Plaintiff and the ALJ also discussed his depression, with Plaintiff indicating that he took medication for his depression and was not talking to a counselor.  Tr. at 91-93.

The ALJ then questioned the VE, presenting him with a hypothetical individual with the same age, education and background as Plaintiff but who was limited to light work with occasional use of rams and stairs, no climbing of ladders, ropes or scaffolds, occasional stooping, kneeling, crouching and crawling, and the avoidance of even moderate exposure to hazards, including heights and machinery.  Tr. at 97.  The VE responded that such a hypothetical person could not perform

Plaintiff's past relevant work, but could perform work existing in significant numbers in the national economy, including the representative occupations of merchandise marker, cashier II, and power screwdriver operator.  *Id.* at 97-98.

The ALJ added the use of a cane to the hypothetical individual and the VE indicated that this person could still perform the cashier II job.  Tr. at 98.  Upon questioning by Plaintiff's counsel, he added the limitation of occasional handling and fingering to the other limitations and the VE responded that this hypothetical individual could not perform any jobs.  *Id.* at 100.  Plaintiff's counsel also added a sit/stand option and the VE responded that jobs would be reduced with this additional limitation.  *Id.* at 101.  Plaintiff's attorney added the limitation that the individual would be off task 20% of the workday due to pain that required him to lie down, and the VE indicated that all work would be precluded.  *Id.* at 101.

## VI.   ANALYSIS

### A.   STEP TWO ANALYSIS AND SUBSEQUENT SEQUENTIAL STEPS

Plaintiff first asserts that the ALJ erred by finding that his depression was not a severe impairment at Step Two and by failing to consider and include limitations relating to his depression throughout the rest of the sequential evaluation process.  ECF Dkt. #12 at 5-10.

At step two of the sequential steps for evaluating entitlement to social security benefits, a claimant must show that he or she suffers from a severe medically determinable physical or mental impairment. 20 C.F.R. § 404.1520(a)(4)(ii). An impairment is not considered severe when it "does not significantly limit [one's] physical or mental ability to do basic work activities." §404.1521(a).

At step two, the term "significantly" is liberally construed in favor of the claimant.  The regulations provide that if the claimant's degree of limitation is none or mild, the Commissioner will generally conclude the impairment is not severe, "unless the evidence otherwise indicates that there is more than a minimal limitation in your ability to do basic work activities." 20 C.F.R. §404.1520a(d). The purpose of the second step of the sequential analysis is to enable the Commissioner to screen out "totally groundless claims." *Farris v. Sec'y of HHS*, 773 F.2d 85, 89 (6th Cir.1985).  The Sixth Circuit has construed the step two severity regulation as a "*de minimis* hurdle" in the disability determination process. *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir.1988).

Under a Social Security policy ruling, if an impairment has "more than a minimal effect" on the claimant's ability to do basic work activities, the ALJ is required to treat it as "severe." SSR 96-3p (July 2, 1996).

Once the ALJ determines that a claimant suffers a severe impairment at step two, the analysis proceeds to step three; any failure to identify other impairments, or combinations of impairments, as severe in step two is harmless error. *Maziars v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir.1987). However, all of a claimant's impairments, severe and not severe, must be considered at every subsequent step of the sequential evaluation process. See C.F.R. §404.1529(d); C.F.R. §§ 404.1520(d).

In the instant case, the ALJ conducted a thorough analysis of Plaintiff's depression and adequately explained his reasons for finding that Plaintiff's depression was not severe at Step Two. Tr. at 51-53. The undersigned recommends that the Court find that substantial evidence supports this determination. The ALJ considered Plaintiff's testimony concerning his depression and his hospitalization for six days after he was found wandering around the Teamsters Union building looking for his girlfriend. *Id.* at 52. He cited to Dr. Misja's evaluations of Plaintiff which included diagnoses of major depression, GAFs of 55, and findings that Plaintiff was minimally limited in the four functional areas due to his depression. *Id.*

The ALJ performed his analysis of the four functional areas and cited to Dr. Misja's reports and other facts and medical reports in the record leading him to conclude that Plaintiff was only minimally limited in the four areas. *Id.* at 52-53. He noted that Plaintiff lived alone in August 2012 and was making his own meals, performing chores and shopping. *Id.* at 52. He also noted that Plaintiff drove himself places. *Id.* From these facts, the ALJ properly concluded that Plaintiff had only minimal limitation in his daily living activities. *Id.* The ALJ indicated that Plaintiff had reported that in 2013, he did not perform any of the household chores and he was living with his ex-wife, but Plaintiff explained that they moved in together because he had no money and his ex-wife did all of the chores because she wanted to help him. *Id.* As to social functioning, the ALJ found only minimal limitations as Plaintiff belonged to the American Legion, he had contact with his children twice a week and he had few friends. *Id.* at 53. In the area of concentration, persistence

-19-

or pace, the ALJ cited to the psychological examinations in which Plaintiff performed very well on serial 7s both times, remembered three and then two words after five minutes, and Dr. Misja found that Plaintiff was minimally limited in this area. *Id*. Finally, as to episodes of deterioration or decompensation, the ALJ noted Plaintiff's hospitalization at St. Vincent's, but found that it was not for an extended duration and no other hospitalizations existed in the record. *Id.*

However, despite his thorough analysis at Step Two, the undersigned recommends that the Court remand the instant case because the ALJ failed to properly consider and conduct a proper analysis of Plaintiff's nonsevere impairment of depression in the subsequent steps of the sequential evaluation, including the ALJ's RFC. RFC is "an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis." SSR 96-8p. The RFC determination is a matter reserved for the ALJ. *See* 20 C.F.R. § 404.1527(d)(2). In determining a claimant's RFC, the ALJ must consider all impairments, "even those that are not severe." 20 C.F.R. § 404.1545; S.S.R. 96–8p, 1996 WL 374184, at *5.

Here, the ALJ provided a thorough analysis of his determination that Plaintiff's depression was not a severe impairment at Step Two. Tr. at 51-53. However, after Step Two, the ALJ fails to mention Plaintiff's depression at all and there is no evidence that he considered Plaintiff's depression in constructing his RFC. The ALJ did note at Step Two the difference between the criteria for the severity determination at that Step and the mental RFC assessment, which requires a more detailed assessment and he stated that "the following residual functional capacity assessment reflects the degree of limitations the undersigned has found in the 'paragraph B' mental function analysis." Tr. at 53. However, this boilerplate language is insufficient to cure the ALJ's lack of a proper RFC analysis. *Johnson v. Colvin,* 2016 WL 3257124, at *5-6 (E.D. Ky. June 13, 2016), citing Patterson v. Colvin, No. 5:14CV1470, 2015 WL 5560121 (N.D. Ohio Sept. 21, 2015) and *Garcia v. Comm'r of Soc. Sec.*, 105 F. Supp. 3d 805, 810-11 (S.D. Ohio 2015).

In *Patterson v. Colvin*, Judge Lioi remanded a social security case where the ALJ failed to either include nonsevere mental impairments in his RFC analysis or explain why they were not included despite the ALJ's thorough Step Two analysis. No. 5:14CV1470, 2015 WL 5560121 (N.D. Ohio Sept. 21, 2015). Judge Lioi rejected the Magistrate Judge's determination that it would be a

-20-

"futile endeavor" to remand the case in order "to have the ALJ move the same explanation regarding [the medical source's opinion on plaintiff's mental health], ...to step four of the sequential evaluation[.]").  Judge Lioi held that SSR 96-8p requires an ALJ to consider all impairments, severe and nonsevere, and an "ALJ's conclusion that an impairment is non-severe is not tantamount to a conclusion that the same impairment – either singly or in combination with a claimant's other impairments – does not impose any work-related restrictions." *Patterson*, 2015 WL 5560121, quoting *Katona v. Comm'r of Soc. Sec.*, No. 14–CV–10417, 2015 WL 871617, at \*6 (E.D.Mich. Feb.27, 2015) (citing 20 C.F.R. § 404.1521(a) [defining a non-severe impairment as an impairment that "does not significantly limit [a claimant's] physical or mental ability to do basic work activities"])(emphasis added).  The *Patterson* Court also noted that "[w]here an ALJ determines that non-severe impairments do not result in any work-related restrictions or limitations, the ALJ 'is required to state the basis for such conclusion.'" 2015 WL 5560121 at \*4, quoting *Hicks v. Comm'r of Soc. Sec.*, No. 12–13581, 2013 WL 3778947, at \*3 (E.D.Mich. July 18, 2013) (citing *White v. Comm'r of Soc. Sec.,* 312 F. App'x 779, 788 (6th Cir.2009)).  Judge Lioi further found that at best, it was unclear whether the ALJ considered the cumulative effect of the claimant's nonsevere mental impairments when formulating her RFC.  *Patterson*, 2015 WL 5560121, at \*4.  She noted that the ALJ's RFC analysis focused solely on the claimant's physical impairments and contained no discussion as to whether her nonsevere mental impairments contributed to an inability to perform basic work activities.  *Id*. at \*5.

Other courts in this Circuit has held the same.  *See Johnson v. Colvin,*2016 WL 3257124, at \*5-6 (E.D. Ky. June 13, 2016)("Because there is no discussion of whether Johnson's non-severe mental impairments contributed to his inability to perform substantial gainful work, remand on this issue is necessary."); *Garcia v. Comm'r of Soc. Sec.,* 105 F.Supp.3d 805, 811 (S.D. Ohio Aug. 18, 2015) ("Failure to state the basis—for including no limitations arising from non-severe impairments—is error." [citation omitted]; *Katona*, 2015 WL 87617, at \*6 (E.D. Michigan Feb. 27, 2015)( "[T]o the extent an ALJ determines that an identified impairment, severe or non-severe, does not result in any work-related restrictions or limitations, the ALJ 'is required to state the basis for such conclusion.' " unpublished (ALJ's failure to consider nonsevere impairments in RFC not only

raises issues concerning harmless error at Step Two, but also raises Step Four reversible error where ALJ must consider limiting effects of all of impairments on claimant's ability to work).

Similarly in the instant case, the ALJ's decision contains no indication that the ALJ considered Plaintiff's nonsevere depression impairment in any other step of the sequential evaluation beyond Step Two. Plaintiff's depression is not mentioned in any of the subsequent steps, the ALJ does not include it in his RFC and he does not explain why Plaintiff's depression did not result in any work-related limitations. Accordingly, the undersigned recommends that the Court remand the instant case.

The undersigned also notes that the ALJ in the instant case indicated that while Plaintiff took medication for his depression, he did not see a psychiatrist or counselor but for four or five times following his hospitalization. Tr. at 52. The ALJ reiterated four times in Step Two that Plaintiff did not receive psychiatric treatment. *Id*. at 52-53. The Court in *Patterson*, citing to SSR 96-7p (now superseded by SSR 16-3p), cautioned about an ALJ drawing conclusions of a claimant's symptoms or functional limitations from a failure to seek regular medical treatment without first considering a claimant's explanations or other information in the record that could explain such failures. 2015 WL 5560121, at *5. Social Security Ruling 16-3p provides in relevant part that an ALJ must not draw any inferences about a claimant's symptoms or limitations from the claimant's failure to pursue regular medical treatment without first considering the claimant's explanation of such failure or information in the record that may provide an explanation. SSR 16-3p. The Ruling indicates that an ALJ may need to recontact the individual or question the individual at the hearing to determine if good reasons exist for not seeking treatment. *Id.* The *Patterson* Court also cited to cases recognizing that a claimant who suffers from mental illness may not comply with treatment as it is a symptom of his condition. 2015 WL 5560121 at *5, citing symptom of her condition, rather than evidence that her condition is not disabling." *Johnson v. Comm'r of Soc. Sec.*, No. 13–12139, 2014 WL 4724751, at *3 (E.D.Mich. Sept.23, 2014) (citing *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 283 (6th Cir.2009) (further citation omitted)); *see, e.g., Martin v. Comm'r of Soc. Sec.*, No. 1:12–CV–1030, 2014 WL 700414, at *11 (W.D.Mich. Feb.24, 2014) (ALJ's credibility determination was not supported by substantial evidence to the extent that the ALJ relied on the

-22-

claimant's lack of mental health treatment where ALJ failed to consider plaintiff's stated reason that he could not afford the treatment); *see also Blankenship v. Bowen*, 874 F.2d 1116, 1124 (6th Cir.1989) ("it is a questionable practice to chastise one with a mental impairment for the exercise of poor judgment in seeking rehabilitation").  The ALJ in this case noted in his Step Two analysis that Plaintiff had informed Dr. Misja at his psychological consultation that he had moved in with his ex-wife because he had no income.  Tr. at 52.  Medical records also indicate that Plaintiff had lost his insurance and had to treat with new providers as a result.  *Id*. at 547.  Whether this is a reason why Plaintiff did not seek regular mental health treatment is uncertain, but the ALJ is cautioned in his use of a claimant's failure to seek mental health treatment as a primary reason for discrediting credibility or his diagnosis.

Based upon *Patterson* and similar cases in this Circuit, the undersigned recommends that the Court remand the instant case for the ALJ to properly consider Plaintiff's depression, in conjunction with his physical impairments, in determining his RFC and Plaintiff's disability status.

### **B.**　　**RFC**

Plaintiff also complains that substantial evidence does not support the ALJ's RFC because he relied upon the opinions of state agency consultants who did not evaluate Plaintiff and he relied upon the opinion of a consultative examiner who the ALJ admitted overestimated Plaintiff's functional abilities.  ECF Dkt. #12 at 10-14.  Plaintiff asserts that the ALJ adopted the opinions of these physicians over objective medical evidence consisting of MRIs, many therapies, a lumbar laminectomy and lumbar fusion, and the opinions of his treating and examining physicians.  *Id*.

Since the undersigned has recommended that the Court remand the instant case based upon the ALJ's failure to sufficiently consider Plaintiff's depression impairment in conjunction with his physical impairments in the RFC, and that consideration and evaluation may impact the rest of the steps in the sequential evaluation process, the undersigned recommends that the Court decline to address these assertions.

### **C.**　　**SENTENCE SIX REMAND**

Plaintiff also requests that the Court remand his case pursuant to Sentence Six of 42 U.S.C.

§ 405(g) on the basis of new and material evidence.  ECF Dkt. #12 at 14-16.  Since the undersigned is recommending that the Court remand the instant case on the basis outlined above, the undersigned recommends that the Court deny this request as moot.

**VII.    CONCLUSION AND RECOMMENDATION**

For the foregoing reasons, the undersigned recommends that the Court REVERSE the Commissioner's decision and REMAND Plaintiff's case for the ALJ to consider Plaintiff's depression beyond Step Two of the sequential evaluation process and to explain his consideration of Plaintiff's depression in his RFC for Plaintiff, whether that impairment is included as impacting the RFC and Plaintiff's physical impairments or whether it is determined not to impact the RFC.

DATE: January 20, 2017

                         */s/George J. Limbert*
                         GEORGE J. LIMBERT
                         UNITED STATES MAGISTRATE JUDGE

ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days of service of this notice.  Fed. R. Civ. P. 72; L.R. 72.3.  Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).